IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Shannon K. Evans, | ) | C/A No.: 1:15-3687-RMG-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

I.      Relevant Background

        A.      Procedural History

On March 11, 2011, Plaintiff filed an application for DIB in which she alleged her disability began on September 10, 2008. Tr. at 161–62. Her application was denied initially and upon reconsideration. Tr. at 108–11, 117–18. On May 30, 2013, Plaintiff had

a hearing before Administrative Law Judge ("ALJ") Thaddeus J. Hess. Tr. at 73–97 (Hr'g Tr.). The ALJ issued an unfavorable decision on July 18, 2013, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 56–72. Subsequently, the Appeals Council denied Plaintiff's request for review,[1] making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 6–8. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on September 16, 2015. [ECF No. 1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 43 years old at the time of the hearing. Tr. at 78. She completed an associate's degree in nursing. *Id.* Her past relevant work ("PRW") was as a manicurist, an occupational health technician, and a registered nurse. Tr. at 94. She alleges she has been unable to work since May 26, 2010.[2] Tr. at 78.

---

[1] The Appeals Council denied Plaintiff's request for review in a decision dated November 14, 2014. Tr. at 6–8. On January 13, 2015, Plaintiff contacted the Appeals Council to request additional time to obtain counsel to represent her in a civil action. Tr. at 4. By letter dated August 14, 2015, the Appeals Council granted Plaintiff's request and allowed her 30 days to file a civil action from the date she received the letter. Tr. at 1. Although Plaintiff filed this action more than 10 months after the Appeals Council issued its decision, the action was timely filed. *See* 42 U.S.C. § 405(g) ("Any individual, after any final decision of the Commission of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision *or within such further time as the Commissioner of Social Security may allow*.") (emphasis added).

[2] Although Plaintiff originally alleged a disability onset date of September 10, 2008, she amended her alleged onset date to May 26, 2010. Tr. at 78, 177, 258.

2.    Medical History

a.    Evidence Prior to Plaintiff's Date Last Insured ("DLI")[3]

Plaintiff has a history of failed cervical fusion at the C5-6 level. Tr. at 290. In early-2009, Domagoj Coric, M.D. ("Dr. Coric"), performed a vertebrectomy at C6 and anterior fusion from C5 to C7.[4] Tr. at 290, 293.

On May 26, 2010, Plaintiff reported persistent stiffness and muscular pain in her neck that radiated between her shoulder blades and intermittently into her right upper extremity. Tr. at 290. She complained of numbness in her left pinkie finger that increased with activity. *Id.* She reported walking up to two miles per day, but stated walking and other activity exacerbated her symptoms. *Id.* Dr. Coric noted no abnormalities on examination. *Id.* He indicated x-rays showed evidence of Plaintiff's prior surgeries, as well as kyphosis and spondylosis at the C4-5 level. *Id.* He noted Plaintiff had residual symptoms, but had reached maximum medical improvement. *Id.* He limited Plaintiff to sedentary work that required she not lift over five pounds; be permitted to frequently change positions; and avoid crawling, squatting, bending, climbing, or looking down for extended periods. Tr. at 291. He assigned a 20 percent permanent partial disability rating to Plaintiff's back. Tr. at 292.

---

[3] According to the Social Security Administration's ("SSA's") Program Operations Manual System ("POMS"), the DLI is "the last day in the last quarter when disability insured status is met." POMS RS 00301.148. Individuals over age 31 must have at least 20 quarters of coverage over a 40-quarter period, ending with the quarter in which the waiting period begins to be insured for DIB. POMS RS 00301.120. Plaintiff's DLI was September 30, 2011. Tr. at 105.

[4] Although the record contains no medical evidence for the period prior to May 26, 2010, other records and Plaintiff's testimony indicate Plaintiff underwent four cervical surgeries prior to her DLI. *See e.g.*, Tr. at 83–84, 90, 274, 290, 293.

On September 20, 2010, Plaintiff complained to Gregory Sanders, PA-C ("Mr. Sanders"), of a three-month history of left ankle pain and swelling. Tr. at 264. Mr. Sanders indicated Plaintiff's MRI showed no fractures, but noted she had some mild swelling and was tender at her lateral collateral ligament complex and posterior talofibular ligament. *Id.* He prescribed an ankle brace and physiotherapy. *Id.*

Plaintiff presented for a physiotherapy evaluation on September 30, 2010. Tr. at 266. She had some mild left ankle edema and tenderness, but demonstrated a normal gait and was able to bear weight. Tr. at 267. She demonstrated reduced left ankle range of motion ("ROM") and strength. *Id.* Rhonda Maloney, PT ("Ms. Maloney), recommended Plaintiff participate in one physiotherapy session per week for four weeks. Tr. at 268. On October 5, 2010, Plaintiff reported no pain, after taking a five-mile walk over the prior weekend. Tr. at 273. She successfully completed physiotherapy, and Ms. Maloney released her from treatment on October 22, 2010, and instructed her to follow a home exercise plan. Tr. at 270.

Plaintiff presented to Joshua Beardsley, PA-C ("Mr. Beardsley"), on October 6, 2010. Tr. at 286. She reported a flare up of neck pain that was intolerable at times and that necessitated she take narcotic pain medications. *Id.* Mr. Beardsley discussed the symptoms with Dr. Coric and discussed further workup with Plaintiff. Tr. at 288. Plaintiff indicated her symptoms had not increased to the point that she was willing to pursue further workup. *Id.* Mr. Beardsley indicated Plaintiff should slowly increase her activities, but refrain from doing things that caused her pain or discomfort. *Id.* He

4

prescribed Naprosyn and encouraged Plaintiff to contact the office if she changed her mind about proceeding with further workup. *Id.*

Plaintiff telephoned Dr. Coric to report increased neck and upper extremity pain on October 27, 2010. Tr. at 284. Dr. Coric recommended she proceed with a myelogram and post-myelogram computed tomography ("CT") scan. *Id.*

On November 12, 2010, Dr. Coric stated he was asked to increase Plaintiff's lifting restriction from five to ten pounds "to see if this would offer her more opportunities from a vocational rehabilitation perspective." Tr. at 281. Plaintiff indicated attempts to lift up to ten pounds had exacerbated her symptoms. *Id.* She complained of constant neck pain that radiated between her shoulder blades and from her neck to her bilateral shoulders. *Id.* She reported numbness in her right little finger and weakness in both of her hands. *Id.* Dr. Coric observed Plaintiff to have mild bilateral hand weakness at 5-/5 and decreased sensation corresponding to the C8 distribution on the right. *Id.* He stated he had reviewed Plaintiff's myelogram and post-myelogram CT scan and that it showed kyphosis at C5-6 that had progressed somewhat since her last study. Tr. at 282. He indicated Plaintiff's spinal cord was draped over her kyphosis, but that the scan showed no evidence of cord compression. *Id.* He noted underfilling of both the C8 nerve roots below Plaintiff's fusion and from C5 to C7. *Id.* He observed increased motion above Plaintiff's fusion at C4-5 and underfilling in the left C5 nerve root. *Id.* He stated there was a solid fusion from C5 to C7 and no evidence for cord compression or gross instability. *Id.* Dr. Coric discussed with Plaintiff the options to treat the kyphosis at C5-6. *Id.* He stated that any attempt to revise the kyphosis would require a major spinal

reconstructive operation. *Id.* He encouraged Plaintiff to delay the additional surgery until her symptoms became "absolutely intolerable." *Id.* He indicated Plaintiff was permanently limited to lifting no more than five pounds. *Id.*

On January 21, 2011, Plaintiff reported to Dr. Coric that she had attempted part-time, sedentary work as a personal care assistant, but was unable to tolerate the job. Tr. at 278. She complained of persistent numbness and tingling in her right upper extremity and pain between her shoulder blades. *Id.* Dr. Coric observed Plaintiff to have mild hand weakness at 5-/5 bilaterally, diminished grip strength, and decreased sensation corresponding to the C8 distribution. *Id.* He noted no other abnormalities. *Id.* He indicated the most recent CT scan showed increased kyphosis at the C7-T1 level, as compared to the 2009 and 2010 studies. Tr. at 279. He stated he did not expect Plaintiff would be able to return to even sedentary work. *Id.*

Plaintiff followed up with Dr. Coric on February 4, 2011. Tr. at 274–75. She reported a decrease in her neck pain and right upper extremity symptoms and indicated the numbness in her right upper extremity was mostly positional. Tr. at 274. Dr. Coric noted that Plaintiff had decreased sensation in the fourth and fifth digits of her right upper extremity. *Id.* The examination was otherwise unremarkable. *Id.* X-rays of Plaintiff's cervical spine showed interbody fusion with anterior plate stabilization at C5 to C7, kyphosis at C5, and posterior fixation at C6-7, but no evidence of instability. *Id.* Electrodiagnostic studies showed no evidence of radiculopathy, but indicated median entrapment of the median and ulnar nerves in Plaintiff's right upper extremity. *Id.* Dr.

6

Coric indicated he did not feel that Plaintiff could return to even sedentary work on a regular basis. Tr. at 275.

Dr. Coric contacted Plaintiff on April 26, 2011, to discuss the results of her recent CT scan. Tr. at 318. Plaintiff reported neck pain and upper extremity radiation. *Id.* Dr. Coric recommended continued nonsurgical pain management. *Id.*

State agency medical consultant Adrian Corlette, M.D. ("Dr. Corlette"), reviewed the record and completed a physical residual functional capacity ("RFC") assessment on June 13, 2011. Tr. at 307–14. He indicated Plaintiff was limited as follows: occasionally lift and/or carry 10 pounds; frequently lift and/or carry 10 pounds; stand and/or walk at least two hours in an eight-hour workday; sit about six hours in an eight-hour workday; occasionally reach overhead, climb ramps/stairs, balance, stoop, and kneel; never climb ladders/ropes/scaffolds, crouch, or crawl; and avoid concentrated exposure to hazards. *Id.*

Plaintiff received a right epidural steroid injection at C5 on July 26, 2011, and a left epidural steroid injection at C4-5 on August 16, 2011. Tr. at 319, 320. On September 7, 2011, Plaintiff complained to Dr. Coric of a constant aching pain in her neck and occasional sharp pain that extended into her shoulders. Tr. at 315. She described difficulty holding her head up after any significant period of activity. *Id.* She indicated injections at C4-5 had provided no significant relief and requested surgical intervention. *Id.* Dr. Coric noted Plaintiff had good motor strength and tone in her upper and lower extremities, but demonstrated decreased sensation to light touch and pinprick in her right fourth and fifth fingers. *Id.* He explained that a cervical MRI from July 15, 2011, and a CT scan from April 4, 2011, showed a solid interbody fusion from C5 to C7, mild

kyphosis centered at C4-5, and spondylosis at C4-5 with a broad-based disc bulge that contacted, but did not appear to compress the cord. Tr. at 316. He indicated it was difficult to ascertain the exact source of Plaintiff's pain. *Id.* He stated it could be the kyphosis and adjacent-level spondylosis, but that would not explain the whole picture. *Id.* He indicated he did not recommend surgery because it may require extension of the fusion from C2-3 to C7-T1 to address kyphosis. *Id.* He stated the required procedure would "have significant potential morbidity" and would "certainly leave her with axial neck pain to the site of the procedure itself." *Id.* Plaintiff persisted in her request to proceed with surgery. *Id.* Dr. Coric indicated he would obtain a standing scoliosis series, consult with other physicians, and contact Plaintiff regarding a treatment plan. *Id.*

### b.    Evidence After Plaintiff's DLI

Plaintiff received epidural injections on the left side at C4-5 on February 10, 2012, and on the right side on March 19, 2012, and July 3, 2012. Tr. at 340, 342, 345.

On September 5, 2012, Plaintiff reported significant improvement following her last two epidural steroid injections. Tr. at 347. She continued to endorse chronic neck pain that radiated up to her skull and down between her shoulder blades, but stated it was tolerable with the injections. *Id.* Dr. Coric observed no abnormalities on examination. *Id.* He noted Plaintiff was neurologically stable and that her symptoms were well-controlled. Tr. at 348. He discussed proceeding with a fourth steroid injection, but warned Plaintiff that she would not be eligible for another injection until February or March of 2013. *Id.*

Plaintiff received a left epidural steroid injection at C5 on September 28, 2012. Tr. at 351. On March 28, 2013, an MRI of Plaintiff's cervical spine showed mild multilevel degenerative disc disease, but no compressive lesion or stenosis. Tr. at 356.

### c.    Evidence Presented to Appeals Council

On March 22, 2013, Plaintiff reported an increase in her cervical pain and daily migraine headaches. Tr. at 42. She reported that recent steroid injections at C4-5 had not decreased her symptoms. *Id.* Physician Assistant Elton S. Clawson ("Mr. Clawson"), ordered an MRI and indicated Plaintiff should follow up with Dr. Coric to discuss its results. Tr. at 43.

Plaintiff followed up with Dr. Coric on April 10, 2013. Tr. at 39. She reported daily neck pain that radiated to her head and triggered migraines, as well as pain that radiated from her shoulder blades through her upper extremities *Id.* Dr. Coric observed no significant abnormalities on examination. Tr. at 39. He indicated the recent MRI showed no evidence of progression of kyphosis or root compression. Tr. at 40. He recommended Plaintiff remain as active as she could tolerate and follow up in one to two years to reassess her kyphosis. *Id.*

Plaintiff presented to Andrew Sumich, M.D. ("Dr. Sumich"), at Carolina Neurosurgery and Spine on June 17, 2013. Tr. at 36–38. Dr. Sumich reviewed Plaintiff's records, examined her, and elected to proceed with epidural steroid injections. *Id.* He administered four trigger-point injections in Plaintiff's bilateral trapezii and rhomboids. Tr. at 37.

On July 23, 2013, Plaintiff indicated to Dr. Sumich that her most recent epidural steroid injection gave her the most relief of any epidural she had received. Tr. at 33. Dr. Sumich performed six trigger-point injections in Plaintiff's bilateral cervical paraspinal musculature, trapezii, and rhomboids. Tr. at 35.

On September 9, 2013, Plaintiff complained to nurse practitioner Brandon Allison ("Mr. Allison"), of a recent flare up of neck pain and headaches. Tr. at 29. She reported difficulty extending her neck, weakness in her right arm, and feeling as if she were "carrying a bowling ball on her head." *Id.* Mr. Allison noted decreased ROM of Plaintiff's cervical spine, 4+/5 right biceps strength, 4/5 right wrist extensor, and 4+/5 right grip. Tr. at 30. He scheduled Plaintiff for a right C4-5 epidural steroid injection and ordered an MRI of her cervical spine. Tr. at 31.

On September 9, 2013, an MRI of Plaintiff's cervical spine showed a new C4-5 central subligamentous disc herniation mildly displacing, but not compressing the spinal cord or C5 nerve root. Tr. at 52. It indicated a slightly greater kyphotic angulation at C4-5. *Id.*

Dr. Sumich administered epidural steroid injections on the right side of Plaintiff's neck at C4-5 on September 16, 2013. Tr. at 45. Plaintiff followed up with Dr. Sumich on October 10, 2013. Tr. at 26–27. She complained of axial neck pain with radiation to her trapezius muscles. Tr. at 26. Dr. Sumich observed Plaintiff to have moderate, decreased ROM of her cervical spine. Tr. at 27. He administered four trigger-point injections in the bilateral trapezii and cervical paraspinal musculature. *Id.*

On November 1, 2013, Plaintiff complained to Dr. Coric of progressively severe neck pain that radiated up to her head and down between her shoulders and through her right upper extremity. Tr. at 22. She endorsed numbness and weakness in her bilateral hands. *Id.* Dr. Coric noted no significant abnormalities on physical examination. Tr. at 22–23. He indicated he reviewed Plaintiff's September 2013 cervical MRI with Plaintiff and her husband. Tr. at 23. Plaintiff was adamant that her symptoms were intolerable and requested to proceed with anterior cervical discectomy and fusion with anterior plate stabilization at C4-5. Tr. at 23–24.

On December 19, 2013, Dr. Coric performed surgery to explore Plaintiff's fusion and remove the anterior Uniplate from C5 to C7. Tr. at 53. He performed anterior cervical discectomy and fusion at C4-5 with placement of a PEEK interbody spacer and local allograft morcellized allograft arthrodesis, as well as anterior plate stabilization of C4 to C7 using an Atlantis translational plating system. Tr. at 53. Dr. Coric noted Plaintiff had a solid fusion from C5 to C7, but had adjacent herniated nucleus pulposus and kyphosis at C4-5. *Id.*

Plaintiff followed up with Mr. Clawson for a six-week postoperative visit on January 31, 2014. Tr. at 19–21. She reported doing well, aside from some incisional discomfort, stiffness, and occasional pain that radiated into her right upper extremity. Tr. at 19. Mr. Clawson indicated Plaintiff's incision had healed completely and that she was continuing to use her bone growth stimulator. *Id.* He described the physical exam as "quite benign." *Id.* He cleared Plaintiff to drive short distances and indicated she should

"continue with her restrictions of no heavy lifting or strenuous activity" until her next visit. Tr. at 21.

Plaintiff presented to Dr. Coric for a six-month surgical follow up visit on May 9, 2014. Tr. at 16–17. Dr. Coric reviewed recent x-rays and a CT scan that showed no evidence of failed instrumentation or significant adjacent-level stenosis. Tr. at 16. He indicated Plaintiff was neurologically stable, but was "very slow going" clinically. Tr. at 17. He encouraged Plaintiff to remain as active as she could tolerate and to start the process of weaning herself from pain medications. *Id.*

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

At the hearing on May 30, 2013, Plaintiff testified she lived with her husband and adult son. Tr. at 79. She indicated she was 5'6" tall and weighed 133 pounds. Tr. at 80. She stated she was right handed. *Id.*

Plaintiff testified she had undergone four cervical fusion surgeries. Tr. at 83. She indicated she experienced pain and stiffness in her neck, shoulder blades, shoulders, and arms; nerve pain and tingling; and tension headaches and migraines. Tr. at 84. She stated her migraines occurred once or twice a week and that she had tension headaches two to four times per week. *Id.* She indicated her migraines lasted from four to 24 hours. *Id.* She testified that her worst pain was in her shoulders and between her shoulder blades. *Id.* She stated she had been diagnosed with osteopenia. Tr. at 85. She indicated she had

osteoarthritis in her right hip that radiated to her knees and caused pain a couple of times per week. *Id.*

Plaintiff testified she was most comfortable in her recliner and that she sat there for 45 minutes to an hour at a time before she could resume light activity. Tr. at 85–86. She stated she could sit in a regular chair for about 30 minutes at a time. Tr. at 86. She indicated she could stand in one place for five to ten minutes at a time. *Id.* She stated she was able to walk to her neighbors' houses and estimated they were no more than 60 yards away. Tr. at 87. She indicated she could lift no more than five pounds. *Id.* She testified that leaning her head down and turning to the left and right caused her pain to worsen. Tr. at 85, 87. She indicated that reaching and lifting overhead significantly exacerbated her pain. Tr. at 88.

Plaintiff testified that Dr. Coric told her she would need additional surgery. Tr. at 88. She stated she needed surgery to correct kyphosis, but that she was delaying it for as long as possible because it was a major surgery that required Dr. Coric to remove all the plates and screws from the prior surgeries and implant a rod. Tr. at 88–89. She indicated she had previously had two fusion surgeries at C6-7 and two fusion surgeries at C5-6. Tr. at 90. She stated she had received a series of epidural steroid injections over the past two years and that they had been helpful. Tr. at 90–91.

Plaintiff testified she had a driver's license. Tr. at 80. She indicated she drove no more than once a week and typically visited the grocery store. *Id.* She stated she visited her neighbors a couple of times per week. Tr. at 89. She testified that she did not sweep, mop, vacuum, or do dishes. *Id.* She indicated she prepared meals three or four times per

week. *Id.* She stated she did not do any gardening or yardwork. *Id.* She indicated she played games on a laptop computer and sat on her porch with her dog on a typical day. Tr. at 90. She stated her husband sometimes washed and dried her hair when she was unable to do it on her own. *Id.* She estimated that she experienced one or two particularly bad days per month. *Id.*

b.    Vocational Expert Testimony

Vocational Expert ("VE") William W. Stewart, Ph. D., reviewed the record and testified at the hearing. Tr. at 92–97. The VE categorized Plaintiff's PRW as a manicurist as sedentary with a specific vocational preparation ("SVP") of three; an occupational health technician as light with an SVP of five; and a registered nurse as medium with an SVP of seven. Tr. at 94. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform sedentary work that required no climbing of ladders, ropes, or scaffolds; only occasional balancing, stooping, kneeling, crouching, and crawling; frequent climbing of ramps or stairs; and avoidance of concentrated exposure to extreme cold, extreme heat, and vibration. *Id.* The VE testified that the hypothetical individual could perform Plaintiff's PRW as a manicurist. Tr. at 95. The ALJ asked whether there were any other jobs in the regional or national economy that the hypothetical person could perform. *Id.* The VE identified sedentary jobs as an order clerk, *Dictionary of Occupational Titles* ("*DOT*") number 249.367-054, with between 3,000 and 4,000 positions in the regional economy and over 100,000 positions nationally; an admissions clerk, *DOT* number 205.362-018, with 3,300 positions in the regional economy and at least 90,000 positions nationally; and a receptionist, *DOT* number

14

237.367-038, with 3,700 jobs in the regional economy and over 100,000 positions nationally. *Id.*

The ALJ asked the VE to assume the same limitations included in the first hypothetical scenario, but to further assume the individual could only occasionally reach overhead and push and pull with the upper extremities. *Id.* He asked if those additional restrictions allowed for performance of the jobs identified in response to the first hypothetical question. *Id.* The VE testified that the additional limitations would not impact the previously identified jobs. *Id.*

For a third hypothetical, the ALJ asked the VE to assume the limitations included in the first and second hypotheticals, but to further assume the individual could move her head up and down and look down on less than an occasional basis. Tr. at 96. The VE stated the individual would be unable to perform any jobs. *Id.*

> 2.    The ALJ's Findings

In his decision dated July 18, 2013, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant last met the insured status requirements of the Social Security Act on September 30, 2011.
2.    The claimant did not engage in substantial gainful activity during the period from her amended alleged onset date of May 26, 2010 through her date last insured of September 30, 2011 (20 CFR 404.1571 *et seq.*).
3.    Through the date last insured, the claimant had the following severe impairments: status post cervical fusion and headaches (20 CFR 404.1520(c)).
4.    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.  After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except should never climb a ladder, rope or scaffold; frequent climbing of ramps and stairs, occasional balancing, stooping, kneeling, crouching, and crawling; should avoid concentrated exposure to cold/heat and vibration; with occasional reaching overhead and occasional pushing and pulling with the upper extremities.

6.  Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7.  The claimant was born on October 6, 1969 and was 41 years old, which is defined as a younger individual age 18–44, on the date last insured (20 CFR 404.1563).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

11. The claimant was not under a disability, as defined in the Social Security Act, at any time from her amended alleged onset date of May 26, 2010, through September 30, 2011, the date last insured (20 CFR 404.1520(g)).

Tr. at 61–68.

II.   Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)  the ALJ erred in failing to accord controlling weight to Plaintiff's treating physician's opinion; and

2)  the Appeals Council did not adequately consider the medical evidence for the period following Plaintiff's DLI.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured

for benefits, who are not of retirement age, who properly apply, and who are under a

"disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any
> medically determinable physical or mental impairment which can be
> expected to result in death or which has lasted or can be expected to last for
> at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations

promulgated under the Act have reduced the statutory definition of disability to a series

of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983)

(discussing considerations and noting "need for efficiency" in considering disability

claims). An examiner must consider the following:  (1) whether the claimant is engaged

in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that

impairment meets or equals an impairment included in the Listings;[5] (4) whether such

---

[5]  The Commissioner's regulations include an extensive list of impairments ("the
Listings" or "Listed impairments") the Agency considers disabling without the need to
assess whether there are any jobs a claimant could do. The Agency considers the Listed
impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to
prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a
claimant meets or equals all criteria of any of the Listed impairments for at least one year,
she will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To
meet or equal one of these Listings, the claimant must establish that her impairments
match several specific criteria or are "at least equal in severity and duration to [those]
criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen*

impairment prevents claimant from performing PRW;[6] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v.*

---

*v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[6] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

*Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

       2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is

substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

      B.     Analysis

          1.     Treating Physician's Opinions

On May 26, 2010, Dr. Coric indicated Plaintiff would be able to tolerate no more than sedentary work activities and would be unable to lift over five pounds. Tr. at 291. He stated she would need the ability to frequently change positions and should avoid crawling, squatting, bending, or climbing. *Id.* He further indicated Plaintiff should not look down for extended periods. *Id.*

On February 4, 2011, Dr. Coric provided the following opinion:

> I have had a long discussion with Shannon and her husband concerning her overall situation and at this juncture, I do not feel like she can return to even sedentary type duties on a regular basis. I do not feel like she can tolerate lifting up to 5 pounds. I do not feel like she can tolerate even 4 hour day and in my opinion, I would not recommend her getting back to work type activities.

Tr. at 275. He further stated he expected Plaintiff's work restrictions to be permanent. *Id.*

Dr. Coric assessed Plaintiff's physical ability to do work-related activities in a medical opinion form dated April 10, 2013. Tr. at 353–55. He indicated the following limitations: occasionally lift and carry less than 10 pounds; frequently lift and carry less than 10 pounds; stand and walk for about two hours during an eight-hour day; sit for about two hours during an eight-hour day; sit for 45 minutes before changing positions; stand for 30 minutes before changing positions; and must walk around for five minutes

during every 90-minute period. Tr. at 353–54. He stated Plaintiff would sometimes need to lie down at unpredictable intervals during a work shift. Tr. at 354. He indicated his opinion was supported by medical findings that Plaintiff was status post C5 to C7 fusion and had adjacent level kyphosis and spondylosis at C3-4, C4-5, and C7 to C11. *Id.* He stated Plaintiff could occasionally twist, crouch, and climb stairs. *Id.* He indicated Plaintiff could never stoop (bend) and climb ladders. *Id.* He suggested Plaintiff's abilities to reach, push, and pull were affected by her impairment and that her pain was increased with certain activities and positions. Tr. at 354–55. He indicated Plaintiff should avoid concentrated exposure to noise and all exposure to fumes, odors, dusts, gases, poor ventilation, and hazards. Tr. at 355. He estimated Plaintiff would likely be absent from work more than three times a month because of her impairments or treatment. *Id.*

Plaintiff argues the ALJ erred in failing to give controlling weight to her treating neurologist's opinion. [ECF No. 7 at 4–5]. She maintains that Dr. Coric advanced work-preclusive functional limitations. *Id.* at 5. She contends the ALJ's decision reflects no analysis of Dr. Coric's opinion under the provisions of 20 C.F.R. § 404.1527(c) and that all of the factors weighed in favor of the opinion. *Id.* at 6, 13–18. She maintains the ALJ discounted Dr. Coric's opinion based on an inaccurate assessment of her daily activities. *Id.* at 7.

The Commissioner argues the ALJ cited sufficient evidence to support his conclusion that Dr. Coric's opinion was not entitled to controlling weight. [ECF No. 8 at 9]. She contends Plaintiff's daily activities were relevant to the ALJ's evaluation of the severity of her symptoms. *Id.* at 10.

21

ALJs must consider all medical opinions of record. 20 C.F.R. § 404.1527(b). The regulations require that ALJs accord controlling weight to treating physicians' opinions that are well-supported by medically-acceptable clinical and laboratory diagnostic techniques and that are not inconsistent with the other substantial evidence of record. 20 C.F.R. § 404.1527(c)(2); SSR 96-2p. If an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he is required to evaluate all the opinions of record based on the factors in 20 C.F.R. § 404.1527(c). *Id.* Those factors include (1) the examining relationship between the claimant and the medical provider; (2) the treatment relationship between the claimant and the medical provider, including the length of the treatment relationship and frequency of treatment and the nature and extent of the treatment relationship; (3) the supportability of the medical provider's opinion in his treatment records; (4) the consistency of the medical opinion with other evidence in the record; and (5) the specialization of the medical provider offering the opinion. *Johnson*, 434 F.3d at 654; 20 C.F.R. §§ 404.1527(c).

A treating source's opinion generally carries more weight than any other opinion evidence of record, even if it not entitled to controlling weight. 20 C.F.R. § 404.1527(c)(2). However, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001), citing *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). Medical opinions that are adequately explained by the medical source and supported by medical signs and laboratory findings should be accorded greater weight than uncorroborated opinions. 20 C.F.R. § 404.1527(c)(3). "[T]he more consistent an

opinion is with the record as a whole, the more weight the Commissioner will give it."
*Stanley v. Barnhart*, 116 F. App'x 427, 429 (4th Cir. 2004), citing 20 C.F.R. § 416.927(d)
(2004)[7]; *see also* 20 C.F.R. §§ 404.1527(c)(4).

The ALJ must give good reasons for the weight he accords to the treating source's
opinion. SSR 96-2p. The notice of decision "must contain specific reasons for the weight
given to the treating source's medical opinion, supported by the evidence in the case
record, and must be sufficiently specific to make clear to any subsequent reviewers the
weight the adjudicator gave to the treating source's medical opinion and the reasons for
that weight." *Id.* However, it is not the role of this court to disturb the ALJ's
determination as to the weight to be assigned to a medical source opinion "absent some
indication that the ALJ has dredged up 'specious inconsistencies,' *Scivally v. Sullivan*,
966 F.2d 1070, 1077 (7th Cir. 1992), or has not given good reason for the weight
afforded a particular opinion." *Craft v. Apfel*, 164 F.3d 624 (Table), 1998 WL 702296, at
*2 (4th Cir. 1998) (per curiam).

A review of the ALJ's reasons for discounting the treating physicians' opinions
reveals them to be insufficient in light of the provisions of 20 C.F.R. § 404.1527(c) and
SSRs 96-2p and 96-6p. In light of the absence of sufficient reasoning or evidentiary
support for the ALJ's decision to accord little weight to the claimant's treating
physician's opinion, the undersigned recommends the court find he inadequately
considered the medical opinions.

---

[7] The version of 20 C.F.R. § 416.927 effective March 26, 2012, redesignated 20 C.F.R. §
416.927(d)(4) as 20 C.F.R. § 416.927(c)(4).

The ALJ decision stated it was "apparent that the claimant was not telling [Dr. Coric] the wide range of daily activities she engaged in." The ALJ indicated he did not give Dr. Coric's opinion more than little weight because claimant's testimony was not consistent with his opinions. In summarizing the claimant's testimony, the ALJ decision characterizes the claimant as being able to care for her personal needs, drive to the grocery store and go shopping, perform light household chores, and visit with friends and neighbors. He also notes that she played on the computer and read, which he found showed that she was able to sit for long periods and hold her neck down. The ALJ cited a lack of consistency between Dr. Coric's opinion and Plaintiff's testimony, but he failed to explain how Dr. Coric's opinion was inconsistent with the record as a whole. Tr. at 66–67.

The ALJ's explanation of his decision to accord little weight to the opinion of Drs. Coric reflects no consideration of the four other factors identified as important in 20 C.F.R. § 404.1527(c). Inconsistency with the other evidence of record is a sufficient reason for declining to accord controlling weight to a treating physician's opinion. 20 C.F.R. §§ 404.1527(c)(2); SSR 96-2p. However, an ALJ's analysis of a treating physician's opinion does not end with a finding that it is not entitled to controlling weight. *See id.* The ALJ must proceed to weigh the opinion based on the factors in 20 C.F.R. §§ 404.1527(c) and 416.927(c). Because the ALJ's decision reflects no consideration of the treating and examining relationships between Plaintiff and Dr. Coric, the supportability of his opinion in his own records, or his specialization, it is insufficient.

2.    Evidence After the DLI

Plaintiff argues the ALJ and Appeals Council erred in failing to properly consider medical evidence after her DLI that was linked to her pre-DLI condition. [ECF No. 7 at 19–26]. She maintains that all of her post-DLI problems were related to her cervical impairments and surgeries that occurred prior to her DLI. *Id.*

The Commissioner argues the evidence Plaintiff submitted to the Appeals Council is not new, material, or related to the relevant time period. [ECF No. 8 at 12–14].

In light of the undersigned's recommendation to remand based on the ALJ's failure to properly weigh Dr. Coric's opinion, the undersigned declines to specifically address Plaintiff's allegation of error related to evidence after Plaintiff's DLI. However, upon remand, the Commissioner should take into consideration Plaintiff's remaining allegation of error.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

1:15-cv-03687-RMG     Date Filed 10/13/16     Entry Number 11     Page 26 of 27

IT IS SO RECOMMENDED.

October 13, 2016                          Shiva V. Hodges
Columbia, South Carolina                 United States Magistrate Judge

**The parties are directed to note the important information in the attached "Notice of Right to File Objections to Report and Recommendation."**

26

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).